**KLEHR, HARRISON, HARVEY, BRANZBURG & ELLERS LLP**
(A Pennsylvania Limited Liability Partnership)
Charles A. Ercole, Esq. (CE 9458)
Lynn A. Collins, Esq. (LC 9787)
457 Haddonfield Road, Suite 510
Cherry Hill, NJ 08002
(856) 486-7900
Attorneys for Plaintiff Andrew Dubler

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW DUBLER, | : CIVIL ACTION |
| | : |
| Plaintiff, | : Docket No. _____ |
| | : |
| v. | : |
| | : **COMPLAINT** |
| HANGSTERFER'S LABORATORIES, | : |
| HANGSTERFER'S LABORATORIES | : **JURY TRIAL DEMANDED** |
| SEVERANCE PLAN, ANN JONES, and | : |
| BETH JONES SHEEHAN | : |
| | |
| Defendants. | |

Plaintiff Andrew Dubler ("Mr. Dubler"), by and through his attorneys, brings this suit against Defendants Hangsterfer's Laboratories ("Hangsterfer's" or "the Company"), Ann Jones ("Ms. Jones"), Beth Jones Sheehan ("Ms. Jones Sheehan"), and the Hangsterfer's Laboratories Severance Plan ("the Plan"), for violations of federal and state law arising out of the wrongful termination of Mr. Dubler's employment and the failure to pay compensation and severance benefits owed to him.

### INTRODUCTION

Prior to his wrongful termination, Mr. Dubler worked for a period of over thirteen years with Hangsterfer's, a chemical manufacturing company which produces coolants and other lubricants for all sectors of the metalworking industry. During the course of his employment

(during which time he received various commendations, bonuses and promotions), Mr. Dubler was responsible for, *inter alia*, sales and general managerial responsibilities relating to Hangsterfer's product lines. In or around 2006, Mr. Dubler became aware of circumstances at the Company that led him to reasonably conclude that Hangsterfer's was acting in violation of federal and state law, including, without limitation, Illinois and New Jersey trade secret law, the federal Lanham Act and the federal Economic Espionage Act. In particular, beginning in 2006 and for the remainder of his employment with the Company, Mr. Dubler repeatedly complained to Hangsterfer's senior personnel, including the Chief Executive Officer, Ann Jones ("Ms. Jones"), and the Compliance Officer, Beth Jones Sheehan ("Ms. Jones Sheehan"), about his well-founded belief that Chris Sheehan ("Mr. Sheehan"), who was rehired by the Company in or around June of 2006, had stolen a chemical formula from his former employer, Fuchs Lubricants Co. ("Fuchs"), for EcoCool S-761, which Hangsterfer's was (and is) passing off under the product name, NeoSol.

As a result of, and in retaliation for, his repeated complaints and opposition to Hangsterfer's policy of promoting, marketing and selling NeoSol – and despite the fact that, on at least one occasion, Ms. Jones Sheehan herself acknowledged that the NeoSol formula had been stolen from Fuchs – Mr. Dubler was wrongfully terminated, without cause and without severance and other compensation owed to him.

In support of his Complaint, Mr. Dubler alleges as follows:

### JURISDICTION AND VENUE

1.       Hangsterfer's Laboratories is a privately-held New Jersey corporation, with its corporate headquarters and principal place of business located in Mantua, New Jersey.

2.     Hangsterfer's Laboratories is an "employer" within the meaning of various state and federal statutes, including the Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. §§ 34:19-1 to 19-8, and the New Jersey Wage Payment Law ("WPL"), N.J.S.A. 34:11-4.1, *et seq.*

3.     Ann Jones is an adult individual residing in New Jersey who was, at all relevant times, the CEO of Hangsterfer's with management control over the Company, and, at all relevant times, was acting on behalf of Hangsterfer's with the consent of the Company, and thus is an "employer" within the meaning of CEPA and the WPL.

4.     Beth Jones Sheehan is an adult individual residing in New Jersey who was, at various times, the Compliance Officer and is now acting as Vice President of Hangsterfer's with management control over the Company, and, at all relevant times, was acting on behalf of Hangsterfer's with the consent of the Company, and thus is an "employer" within the meaning of CEPA and the WPL.

5.     Andrew Dubler is an adult individual residing in New Jersey who was, at all relevant times, the sales director and/or general manager of Hangsterfer's before being wrongfully discharged from employment with Company, without cause, severance or payment of amounts owed to him, in violation of, *inter alia*, CEPA, the WPL and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*

6.     The Court has jurisdiction over the ERISA claims pursuant to 28 U.S.C. § 1331, and pendant jurisdiction over the CEPA, the WPL, and the state common law claims under 28 U.S.C § 1367.

7.     Venue is proper as both Plaintiff and Defendant Hangsterfer's reside in this judicial district.

## FACTUAL BACKGROUND

8.     Mr. Dubler was originally employed by Hangsterfer's in a sales capacity, working in Hangsterfer's offices in Mantua, New Jersey.  As set forth above, Hangsterfer's is a closely held New Jersey corporation with approximately 45 employees that produces coolants and other lubricants for all sectors of the metalworking industry.  This is a highly specialized, technical field, with only a few identified high quality competitors, including Fuchs, the major metalworking coolant manufacturer in the industry.

9.     During the course of his employment with Hangsterfer's, Mr. Dubler was promoted, on or around December 2004, to the position of Director of Sales, and later, on or around August 2008, given the title of General Manager.  During the relevant time period, Mr. Dubler was responsible for, *inter alia*, overseeing Hangsterfer's sales efforts for its various product lines.  For most of this time, he reported generally to Ms. Jones, the CEO and principal shareholder of Hangsterfer's, as well as to Leslie Jones, the President of Hangsterfer's (and Ms. Jones' daughter).  Beth Jones Sheehan (another one of Ms. Jones' daughters) acted for a period of time (including during the 2006-2007 timeframe) as the Compliance Officer of Hangsterfer's, and subsequently assumed additional executive powers after Leslie Jones resigned as President of the Company in or around August 2009.

### Mr. Sheehan's Return To Hangsterfer's And The Stolen Formula

10.     In or around June 2006, Hangsterfer's made the decision to rehire Chris Sheehan, who was then still married to Ms. Jones Sheehan.  Mr. Sheehan had previously worked for Hangsterfer's for a period of time, before being terminated by the Company in or around 2002.  Immediately prior to returning to employment with Hangsterfer's in June 2006, Mr. Sheehan had been working for Fuchs, a competitor of Hangsterfer's, in Fuchs' Baltimore, Maryland location.

Fuchs is the largest manufacturer of metalworking fluids (significantly larger than Hangsterfer's), with manufacturing facilities in 48 countries around the globe, including eight facilities in the United States.  At the time of his rehire, Mr. Sheehan told Mr. Dubler that, while at Fuchs, he had been working as a "Division Manager" at Fuchs' Baltimore location.

11.  Upon his return to Hangsterfer's, Mr. Sheehan was given the position of Technical Director for the Company.  Mr. Dubler openly questioned the decision to hire Mr. Sheehan for such a highly technical position at the Company, noting that Mr. Sheehan had only completed a high school education (with no bachelor's or advanced degrees) and had had no formal training, experience or background in chemistry or in developing or resolving technical issues related to chemical formulae.

12.  Even more improbable at the time of Mr. Sheehan's rehire was the fact that Mr. Sheehan announced that he had "developed" – apparently in his spare time, while still employed at Fuchs, on his own – several formulae for industrial solvents that he wanted Hangsterfer's now to manufacture and sell.  Mr. Sheehan claimed that these formulas would eliminate the problem of foaming and residue, which had been a persistent problem with Hangsterfer's solvent formulations (and which was beginning to have a negative impact on the Company's sales).  Mr. Sheehan explained to Mr. Dubler that he wanted to call the new product "NeoSol," which meant "new day" in Latin.  The formula that Mr. Sheehan provided to Hangsterfer's was far more complicated than the typical Hangsterfer's formula, with many more ingredients and with various ingredients (including one ingredient, which Mr. Sheehan told Mr. Dubler was the "go go juice") that Hangsterfer's had not used before in its solvent formulations.

13.     Importantly, in the months just prior to Mr. Sheehan leaving Fuchs and returning to Hangsterfer's to announce his newly developed "formula" for non-foaming chemical solvent, Fuchs had itself announced and begun marketing a new product which it named EcoCool S-761, which was also specifically designed to address "foaming" and issues involving degradation while in machining equipment sumps. Fuchs launched the new product beginning in or around April 2006 (just two months before Mr. Sheehan left Fuchs to rejoin Hangsterfer's), with great fanfare and market success. Indeed, Fuchs has stated in court filings that EcoCool S-761 became its "most important and innovational metalworking product of the last two years" and that, after launching it in April 2006, "quickly bec[a]me one of [Fuchs'] top products and the lead product for its application." By 2007, Fuchs' revenues from EcoCool S-761 had increased five-fold and its customer base for the product had expanded tremendously during the same period of time. In September 2007, Fuchs was awarded a Pratt & Whitney approval award for EcoCool S-761. Since that time, EcoCool S-761 has been approved for variety of uses, by Boeing and various other metal-manufacturing companies.

14.     Fuchs has asserted in Court filings that information related to EcoCool S-761 – in particular, the chemical ingredients that go into the product, the amounts of those ingredients, the conditions under which the ingredients are added, and the order in which the ingredients are added, is all confidential and proprietary information, which is maintained in a highly confidential manner at the company. Fuchs has stated that it has invested substantial time and money in developing these formulae, including specifically the formula for EcoCool. Fuchs has stated its express concern that a competitor could use this information, if wrongfully obtained, in order to develop an identical product and thereby unfairly price and/or move customer relationships away from Fuchs.

15.     On information and belief, Mr. Sheehan misappropriated the formula for EcoCool S-761 while he was employed at Fuchs and presented that formula to Hangsterfer's, which Hangsterfer's has since used to create the Hangsterfer's product named NeoSol.

16.     Upon being told that Mr. Sheehan, with only a high school degree, had allegedly "developed" a non-foaming chemical solvent, in his spare time, without a lab background, lab team or lab equipment – and that he did so coincidentally at the same time that he was working at a Company, Fuchs, that had just introduced a nearly identical, non-foaming chemical solvent product, Mr. Dubler began expressing great alarm and concern to Hangsterfer's senior personnel. Mr. Dubler spoke with both Pat Brewer, a Hangsterfer's employee, and Ms. Jones, the CEO, who said they would "investigate" the matter as to whether Mr. Sheehan had stolen the formula. Ms. Jones subsequently reported back to Mr. Dubler that they had spoken to Mr. Sheehan and that he had "sworn on his children" that he had not stolen the formula from Fuchs. This was apparently the extent of the "investigation." No investigation was apparently done into Mr. Sheehan's lab notes or methods, the process of invention, how Mr. Sheehan had derived or could have derived the formula or, for that matter, how he had or could have independently done testing or product formulations while he was still employed by Fuchs.

17.     In speaking directly with Mr. Sheehan, Mr. Dubler's concerns were further heightened by the fact that Mr. Sheehan would often make specific and direct comparisons between the functionality of his new product NeoSol and the product of his former employer's, EcoCool S-761. Compounding these concerns was the fact that, at or around the same time, Mr. Sheehan gave Mr. Dubler copies of internal Fuchs' financial spreadsheets that Mr. Sheehan had taken from Fuchs – which Mr. Dubler, in turn, told Mr. Sheehan that he did not want and would not use in his capacity as Hangsterfer's Sales Director.

18.     Despite Mr. Dubler's stated concerns – and despite his belief that other Hangsterfer's senior personnel were well aware that the NeoSol formula had been stolen from Fuchs – Hangsterfer's started marketing and selling NeoSol as its own product.  In or around September 2006, just *three* months after Mr. Sheehan had rejoined the Company and produced the non-foaming chemical formula (and just *five* months after Fuchs had launched EcoCool S-761), Hangsterfer's announced that it had developed a new product to be named NeoSol 300.  In a statement to the press, Hangsterfer's claimed that, with the new NeoSol product, "[f]oam is virtually non-existent, even at high pressures."  Hangsterfer's further claimed to the press that it had "been working on this problem *for some time now*, the result of [Hangsterfer's] *labours* is a new range of coolants designated Neo[S]ol."  Such a claim was made notwithstanding the fact that NeoSol was developed – not from extensive efforts and lengthy "labours" of Hangsterfer's staff in Hangsterfer's laboratories – but rather from a formula handed to them from a former Fuchs' employee, with no chemical background, just three months earlier.

19.     The product was officially launched and ready for shipment in or around October, 2006.  In or around May 2007, Hangsterfer's issued a press statement, noting that it would be featuring its "full-range of metalworking fluids" at the 2007 EASTEC show.  The release specifically touted the NeoSol product line, claiming that "[t]he NeoSol product line represents a combination of *years of research and development* along with *close monitoring of industry trends*" – even though, again, the claim that the formula represented "years of research and development" by Hangsterfer's was patently false.

20.     Not long after the NeoSol product launch, on or around June 6, 2007, Ms. Jones Sheehan approached Mr. Dubler in his office, and asked him generally how he thought things were going at the Company.  Mr. Dubler told her he was very "upbeat" about the direction of the

Company, except for one major issue. When Ms. Jones Sheehan questioned what that issue was, Mr. Dubler stated, again, his concerns and well-founded belief that the NeoSol product formula had been misappropriated from Fuchs and that it could, among other things, subject the Company to significant legal exposure. Mr. Dubler stated that Ms. Jones Sheehan should be particularly aware of this and concerned about it in her capacity as Compliance Officer for the Company. Upon Mr. Dubler's making these statements about NeoSol and the origin of NeoSol, Ms. Jones Sheehan's demeanor immediately changed. She stated to Mr. Dubler that "you and I both know where those formulas came from, but they will never be able to prove anything"; she further speculated that Fuchs' and/or Hangsterfer's products had likely changed since the original formulation, and reiterated that they [Fuchs] would be able to "prove nothing." Mr. Dubler maintained his position that it was wrong and illegal for the Company to be marketing products based on clearly misappropriated formulae. Ms. Jones Sheehan left Mr. Dubler's office following this conversation visibly angry. Concerned about the amount of anger expressed by Ms. Jones Sheehan towards him during this conversation (and concerned for the security of his position at the Company), Mr. Dubler documented the conversation, in writing, on or around June 14, 2007.

21.     Mr. Dubler subsequently had conversations with attorneys from Capehart and Scatchard, Hangsterfer's primary outside attorneys, regarding the issue of NeoSol and Mr. Dubler's beliefs as to the formula's theft.

22.     During the course of the next several months, through 2007 and 2008, Mr. Dubler continued to state, both to Ms. Jones and Leslie Jones, that the Company should cease marketing the NeoSol product line. Although Leslie Jones, the President, was sympathetic to Mr. Dubler during this time and, indeed, appeared to share some of the concerns expressed by Mr. Dubler

about NeoSol, Ann Jones, the CEO, was the final decision-maker and ignored Mr. Dubler's opposition, complaints and concerns. The NeoSol product line continued to be marketed. Mr. Dubler, who opposed the sale of NeoSol, however, did what he could to remove the focus and/or promotional efforts on the NeoSol product line in his position as director of sales.

23.     At some point in time thereafter, Mr. Dubler learned that Ms. Jones Sheehan (who had remained distant and hostile to Mr. Dubler since the June 2007 conversation) had complained to Ms. Jones that Mr. Dubler was not putting enough focus on promoting/selling the NeoSol products. Ms. Jones spoke with Mr. Dubler about this and stated to Mr. Dubler that Ms. Jones Sheehan "hated" him because of his stance and comments on NeoSol. Mr. Dubler continued to express his concerns and continued to work to convince the Company to move away from marketing and selling NeoSol.

24.     As the months progressed, various issues were being reported regarding the functionality and workability of the NeoSol product. On information and belief, while Mr. Sheehan had obviously misappropriated the specific chemical formula from Fuchs, he apparently did not have and/or did not know some of the operational conditions (such as the temperature, order of ingredients, etc.) that were needed to produce the formula correctly in the Hangsterfer's laboratories. Accordingly, the NeoSol formulation was not working correctly or as well as EcoCool S-761, and there were problems being reported from various NeoSol customers.

25.     As a result of the problems with the NeoSol product, Mr. Sheehan proceeded to recruit Nancy Hudak, a Fuchs Laboratory Director and chemist with a strong chemical background, who had worked for Fuchs for a number of years, to come work for Hangsterfer's in order to help Hangsterfer's work on resolving the issues related to NeoSol. On information and belief, Mr. Sheehan directed Ms. Hudak to obtain confidential and trade secret information

related to Fuchs' handling and production of the EcoCool product to bring with her to Hangsterfer's in order to resolve the issues related to NeoSol. Ms. Hudak accepted the position with Hangsterfer's on or around June 7, 2007, although she did not announce her resignation to Fuchs for some time, until on or around September 4, 2007.

26.    After Ms. Hudak left employment with Fuchs in September 2007 and commenced working at Hangsterfer's, Fuchs subsequently determined that Ms. Hudak had copied certain files (which files, they noted particularly focused on the EcoCool S-761 product) to a movable media storage device, which copying had been done just before her announced resignation from Fuchs, on or around August 30, 2007 and August 31, 2007.

27.    On or around October 17, 2007, counsel for Fuchs wrote to Hudak and Hangsterfer's, stating that their computer forensic findings had detected that Hudak had copied, *inter alia*, EcoCool-related information, and demanding that Hangsterfer's immediately:   cease and desist from using any Fuchs' confidential, proprietary and/or trade secret information; immediately turn over to Fuchs any and all confidential, proprietary and trade secret information, including but not limited to information contained in document or stored in electronic format taken by Ms. Hudak; and cease permitting Ms. Hudak from working in her position as a chemist for Hangsterfer's. On information and belief, Hangsterfer's did not comply with the demands of the letter, and certainly did not do so with respect to Fuchs' information that had been taken earlier by Mr. Sheehan.   Indeed, despite the serious allegations in the letter, Hangsterfer's allowed Hudak to remain employed for a period of several weeks, without any response to Fuchs' demands, until litigation ensued. On or around October 24, 2007, Mr. Dubler (along with Leslie Jones) had met with Ms. Jones to advocate confronting both Mr. Sheehan and Ms. Hudak

about the NeoSol/Eco-Cool formulae, in order to resolve the issue once and for all.   On information and belief, this was never done.

28.     On or around October 30, 2007, Fuchs filed a Verified Complaint against Ms. Hudak in the United States District Court for the Northern District of Illinois, Docket No. 07CV6140, alleging that Ms. Hudak had violated trade secret and other laws by misappropriating information relating to, *inter alia*, EcoCool.

29.     On or around November 6, 2007, the Court entered a Temporary Restraining Order in the *Hudak* case, which directed Hudak *and all entities working with her* – including Hangsterfer's – on or before November 13, 2007, to produce for examination any computer equipment "that currently contains or at any time in the past contained any of [Fuchs'] confidential or proprietary information, including, but not limited to, any confidential or proprietary information regarding [Fuchs'] product known as EcoCool-761." The Court's Order specifically required Hangsterfer's to turn over <u>all</u> Fuchs' confidential information in Hangsterfer's possession – not just that obtained by Hudak.   On information and belief, Hangsterfer's did not comply with this Court order – and to this day retains confidential and proprietary information belonging to Fuchs, including, without limitation, the formula for EcoCool S-761.

30.     After being notified of the Court's Order (which had a compliance deadline of November 13, 2007), Hangsterfer's still did not do anything until November 12, 2007, when it finally suspended Ms. Hudak's employment, before ultimately terminating her employment on December 11, 2007.   Hangsterfer's, however, continued to refuse to turn over the Fuchs' confidential information in its possession.

12

31.    On or around November 28, 2007, a Hangsterfer's Board meeting was held, where Mr. Dubler, Ms. Jones and Ms. Jones Sheehan and others were present to discuss, *inter alia*, the *Hudak* litigation.  Mr. Dubler raised, again, the question of the origin of the NeoSol formula, and reminded Ms. Jones Sheehan of their earlier (June 2007) conversation, wherein she acknowledged that the formula had been stolen from Fuchs.  Ms. Jones Sheehan angrily denied that this conversation ever occurred in front of the group assembled.  After the meeting was over, Ms. Jones Sheehan asked Mr. Dubler if he had taped their prior conversation, commenting that she would not "put anything past him."  He replied that he had not, although he had made a written memorialization of the discussion.  Later that evening, Ms. Jones called Mr. Dubler at home to say that Ms. Jones Sheehan was very upset that Mr. Dubler was raising the concerns about the origin of the NeoSol formula at a Board meeting while the *Hudak* litigation was ongoing; she commented further that no personnel changes would be made (in particular, any affecting Mr. Sheehan) while the litigation was pending.

32.    As the *Hudak* litigation progressed, Fuchs sought discovery from Hangsterfer's, including subpoenaing Hangsterfer's for information related to Fuchs that had been shown or discussed with Hudak.  Alarmed, Hangsterfer's proceeded to obstruct any attempts to provide information to Fuchs that would reveal that the NeoSol formula was derived from the EcoCool formula.  Hangsterfer's, through its counsel, Betsy Ramos, Esquire, of Capehart & Scatchard, P.C., objected to producing information on the grounds that producing information would reveal *Hangsterfer's* confidential, proprietary and trade secret information.  Ms. Ramos certified, under penalty of perjury, that, based on her own review, that the relevant documents "include confidential and proprietary information of Hangsterfers"; she asserted that "[a]ccess to or dissemination or disclosure of Hangsterfer's proprietary and confidential information to [Fuchs],

or any competitor would have a devastating effect *on Hangsterfers*"; indeed, Hangsterfer's, through Ms. Ramos, went so far as to state that a "competitor [such as Fuchs] would be able to use such confidential and proprietary information to duplicate or replace [*Hangsterfer's*] products, undercut pricing, interfere with customer and supplier relations and otherwise damage Hangsterfer's business, reputation and products."   Ms. Ramos offered to produce documents, but only if they were both heavily redacted and not shown to anyone at Fuchs.  She went on to assert, falsely, that "an IT consultant could certainly determine, by simply checking a document's properties, if a document was [Fuchs'] or Hangsterfer's, when the document was created, and by whom."

33.   In or around February 2008, Mr. Dubler learned that senior Hangsterfer's personnel were caucusing about the fact that Ms. Hudak had testified at her deposition that, as a chemist, she had reviewed the formulae for NeoSol and EcoCool S-761, and thought the NeoSol formula looked very "familiar" and "similar" to that of EcoCool.  Leslie Jones, President, shared her concerns with Mr. Dubler about how the Company could resolve the litigation without revealing the NeoSol formula or that Mr. Sheehan had taken the formula.

34.   On or around May 6, 2008, Hangsterfer's entered into a consent judgment, agreeing that Hangsterfer's would be permanently enjoined from using any Fuchs information (including, but not limited to EcoCool S-761).  Ms. Ramos, however, managed to limit the scope of the consent judgment to only that information obtained from Ms. Hudak.

35.   Throughout this time, Mr. Dubler continued to express his concerns about NeoSol, Mr. Sheehan and Mr. Sheehan's attempts to recruit Ms. Hudak to "fix" NeoSol. Although the Company resolved to terminate Mr. Sheehan's employment, it continued (and continues) to market NeoSol.

36.     Following the departure of Mr. Sheehan from the Company, Mr. Dubler continued to pursue a course of arguing that the Company should cease marketing and selling the NeoSol product.   In or around April/May 2009, Mr. Dubler was speaking generally with Ms. Jones about the Company's long range planning.   Mr. Dubler mentioned that the Company still had a major problem/exposure related to NeoSol.   Ms. Jones told him not to "ever bring [NeoSol] up again" and stated that Ms. Jones Sheehan "still hates you" because of his past complaints about NeoSol.

### Departure of Leslie Jones From The Company And Termination Of Mr. Dubler's Employment

37.     Mr. Dubler learned, in mid-2009, that Leslie Jones was leaving the Company and that she was "retiring" from the Company (even though her mother, Ms. Jones, was still working as CEO).   Leslie Jones told Mr. Dubler that she was tired of the political maneuvering and various pressures at the Company.

38.     With Leslie Jones (who had been Mr. Dubler's sympathetic ear on the NeoSol and other issues and sometime protector while at the Company) now retiring, Ms. Jones told Mr. Dubler that Ms. Sheehan Jones would assume a more prominent role and assume more authority in the Company,

39.     Leslie Jones officially retired from the Company, on Friday, July 31, 2009.   On Monday, August 3, 2009 – *the very next business day* after Leslie Jones was gone from the Company – Ms. Jones summarily informed Mr. Dubler that he was being terminated.   During the termination meeting, Ms. Jones did not give *any* reason for the termination.   Later, Ms. Jones told others at the Company that they had decided to "eliminate" Mr. Dubler's position.

40.     In the month prior to his wrongful termination (and as Leslie Jones was preparing for her early retirement), Mr. Dubler had begun to sense a change in the environment.   Indeed,

Ms. Jones had largely stopped communicating with him; Mr. Dubler also noted that he was not invited to an office meeting held in mid-July that he typically would attend.

41.    On or around Friday, July 17, 2009, Mr. Dubler asked to meet with Ms. Jones to express his concerns – and, in particular, his concern about what would happen to him once Ms. Jones Sheehan took over in a leadership role, particular given Ms. Jones Sheehan's continuing animosity to Mr. Dubler after his repeated opposition to selling NeoSol.  During this meeting (just ten days before his wrongful termination), Ms. Jones assured him that everything was fine, that there were no reasons for concern, and that he was doing a good job with the Company.

42.    A few days after his meeting with Ms. Jones, as Mr. Dubler was making a business trip to visit certain Hangsterfer's sales managers in the field, he spoke to a Hangsterfer's employee by telephone, who told him he had heard that Mr. Dubler was "going to be fired." Mr. Dubler canceled the remainder of his trip, and flew back to the office.  He learned that, although Leslie Jones and others had tried to stick up for him in July discussions, Ms. Jones Sheehan was now intent on firing him from the Company.

43.    As set forth above, at the time of his termination, Mr. Dubler was given no reason for the termination.  Although Mr. Dubler was terminated without cause (through a belatedly announced "position elimination"), he was not offered any severance as part of the termination, in violation of Hangsterfer's severance plan and standard policies and procedures, which provides for one week of severance for every year of service with the Company for a termination without cause.

44. During his termination meeting with Ms. Jones, Mr. Dubler stated his belief that he was being terminated due to his whistleblowing complaints regarding NeoSol. Ms. Jones issued only a weak denial, then commented that "you're going to have to prove it."

45. During the months/years since NeoSol was first introduced, Hangsterfer's has made approximately four to six million dollars ($4-6,000,000) on NeoSol sales.

46. Ten days following Mr. Dubler's termination, a Hangsterfer's board meeting was held, on or around August 13, 2009, in which Ms. Jones Sheehan announced that the Company was going to expand its promotional efforts with respect to the NeoSol product line, a move that Mr. Dubler had long opposed.

47. On information and belief, Hangsterfer's termination of Mr. Dubler's employment was wrongful and in retaliation for his complaints and opposition to the promotion and sale of the NeoSol product line on grounds that the product was based on a stolen formula.

### Facts Related To Mr. Dubler's Claim For Severance

48. Hangsterfer's has a long-standing severance policy and plan wherein employees of the company who are terminated without cause are eligible to receive severance pay, equal to one week of base salary for every year of the employee's service.

49. Severance benefits are provided under the Hangsterfer's severance plan pursuant to the terms of a written severance agreement.

50. Mr. Dubler was terminated, on or around August 3, 2009, without prior notice or cause. As a result of this termination, Mr. Dubler was eligible for severance under the Hangsterfer's severance plan, but was not offered or provided with any severance agreement or severance benefits, in violation of Hangsterfer's Severance Plan.

**Facts Related To Hangsterfer's Failure To Pay Bonus To Mr. Dubler**

51.     In or around December 2008 (approximately eight months prior to his termination), Mr. Dubler earned an annual bonus equal to $55,000.  Although most Hangsterfer's employees received their annual bonuses at this time, Mr. Dubler did not.  Hangsterfer's indicated that it wished to defer payment of Mr. Dubler's bonus for a period of time, to which Mr. Dubler reluctantly agreed.  Demand has been made for payment of the bonus to Mr. Dubler.  The bonus amount owed to Mr. Dubler still has not been paid.

52.     Also in or around December 2008, Mr. Dubler agreed to lend the Company some $20,000, which amounts were made from his personal wages, with the understanding that such amounts would be repaid by the Company, with interest.  Demand was made for repayment of the loan to Mr. Dubler.  The principal and interest on this amount $20,634.00 were belatedly paid to Mr. Dubler on or around September 12, 2009.

## COUNT ONE

### CONSCIENTIOUS EMPLOYEE PROTECTION ACT
**Against Defendants Hangsterfer's Laboratories, Ann Jones and Beth Jones Sheehan**

53.     Plaintiff incorporates paragraphs 1 through 52 as if set forth herein at length.

54.     Mr. Dubler's complaint and opposition about Hangsterfer's unethical and illegal practice of using a misappropriated formula from Fuchs is protected conduct under the meaning of CEPA.

55.     Mr. Dubler reasonably believed that his employer's conduct was violating a law or a rule or regulation promulgated pursuant to law.

56.     Mr. Dubler engaged in whistleblower activity through his actions of complaining and/or opposing the practice of Hangsterfer's passing off a stolen product formula as its own.

57.    Mr. Dubler was ultimately terminated as a result of his whistleblower activity, which termination constitutes an adverse employment action under CEPA.

58.    There is a causal connection between Mr. Dubler's whistleblower complaints and his termination.   Indeed, Mr. Dubler was terminated the next business day after Ms. Jones Sheehan took over for Leslie Jones after her retirement.

59.    Both Ms. Jones and Ms. Jones Sheehan are "employers" under the meaning of CEPA, insofar they were, at relevant times, officers with management control over the Company, who were acting on behalf of the Company with its consent.

60.    Because of the violation of CEPA, Mr. Dubler requests damages against Hangsterfer's Laboratories, Ms. Jones and Ms. Jones Sheehan for:

      a.    Lost wages (back pay, front pay and fringe benefits);

      b.    Compensatory damages;

      c.    Punitive damages;

      d.    Attorneys' fees and costs; and

      e.    Such other relief as the Court deems reasonable and appropriate.

WHEREFORE, Plaintiff, Andrew Dubler, demands judgment against Defendants Hangsterfer's Laboratories, Ms. Jones and Ms. Jones Sheehan, jointly, severally, and in the alternative for damages; losses; interest; costs of suit; reinstatement of Plaintiff's job title, duties and responsibilities; injunctive relief; attorney's fees; punitive damages and other such relief as the Court deems just and proper.

## COUNT TWO

### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY
### Against Defendants Hangsterfer's Laboratories, Ann Jones and Beth Jones Sheehan

61.     Plaintiff incorporates paragraphs 1 through 52 as if set forth herein at length.

62.     In *Pierce v. Ortho Pharmaceutical*, 84 N.J. 58 (1980), the New Jersey Supreme Court held that employees cannot be discharged in violation of public policy.

63.     As set forth above, Plaintiff complained repeatedly about unlawful actions by Hangsterfer's and Hangsterfer's employees, which actions included misappropriation of a chemical formula related to NeoSol which was passed off as a Hangsterfer's product formulation.

64.     Because of his complaints regarding this conduct, Hangsterfer's retaliated against Mr. Dubler and terminated him on or around August 3, 2009.

65.     All of the retaliatory actions discussed above were vicious, willful, wanton, intentional, and knowingly designed to cause the Plaintiff harm.

66.     Ms. Jones and Ms. Jones Sheehan are "employers" of Mr. Dubler for purposes of New Jersey common law.

67.     Because of Defendants' violation of public policy by adversely treating and ultimately discharging Plaintiff, Plaintiff requests the following damages:

        a.     Lost wages (back pay, front pay and fringe benefits);

        b.     Compensatory damages;

        c.     Punitive damages; and

        d.     Attorneys' fees and costs; and

        e.     Such other relief as the Court deems reasonable and appropriate.

WHEREFORE, Plaintiff, Andrew Dubler, demands judgment against Defendants Hangsterfer's Laboratories, Ms. Jones and Ms. Jones Sheehan, jointly, severally, and in the alternative for damages; losses; interest; costs of suit; reinstatement of Plaintiff's job title, duties and responsibilities; injunctive relief; attorney's fees; punitive damages and other such relief as the Court deems just and proper

## COUNT THREE

### VIOLATION OF ERISA – FAILURE TO PAY SEVERANCE BENEFITS
### Against Defendants Hangsterfer's Laboratories and the Hangsterfer's Severance Plan

68.     Plaintiff incorporates paragraphs 1 through 52 as if set forth herein at length.

69.     On information and belief, Hangsterfer's has established a policy and practice of providing severance to employees who are terminated without cause, the terms of which are memorialized in various written severance agreements that have been provided to past Hangsterfer's employees.

70.     On information and belief, the Hangsterfer's Severance Plan is a welfare benefit plan subject to the provisions of ERISA. Hangsterfer's Laboratories is a fiduciary and plan administrator for the Hangsterfer's Severance Plan.

71.     On or around August 3, 2009, Mr. Dubler was terminated from employment with Hangsterfer's, without cause. As such he was eligible for severance benefits under the Hangsterfer's Severance Plan. Defendants, however, failed or refused to provide the severance benefits, as required.

72.     Mr. Dubler has made demand for severance benefits, which demand has received no response, indicating that any further action to exhaust remedies would be futile.

73.     The denial of benefits to Mr. Dubler under the Hangsterfer's Severance Plan is a violation of the terms of the Severance Plan, and is a violation of ERISA.

74.     As a result of Defendants' violations of ERISA, Mr. Dubler seeks relief under Section 502(a)(I)(B) and/or 502(a)(3) of ERISA, and seek amounts equal to the sum of:

     a.     His respective lost severance;

     b.     His insurance premiums for continuation of health and medical insurance benefits for the severance period;

     c.     Interest for the time value of the lost payments and benefits;

     d.     Attorneys' fees and costs; and

     e.     Such other relief as the Court deems reasonable and appropriate.

WHEREFORE, Plaintiff, Andrew Dubler, demands judgment against Defendants Hangsterfer's Laboratories and Hangsterfer's Severance Plan, jointly, severally; for wrongfully denied benefits and losses; interest; costs of suit; injunctive relief; attorney's fees; and other such relief as the Court deems just and proper

## COUNT FOUR

### VIOLATION OF NEW JERSEY WAGE PAYMENT LAW
### FAILURE TO PAY SEVERANCE BENEFITS AND BONUS

### Against Defendants Hangsterfer's Laboratories, Ann Jones and Beth Jones Sheehan

75.     Plaintiff incorporates paragraphs 1 through 52 as if set forth herein at length.

76.     As set forth above, Hangsterfer's has failed or refused to pay Mr. Dubler various amounts owed in wages, including, without limitation, severance benefits and a bonus of $55,000.

77.     On information and belief, the amounts owed to Mr. Dubler constitute wages under the WPL.

78.     Plaintiff has demanded payment of the amounts owed, but has received no response.

79.     Both Ms. Jones and Ms. Jones Sheehan are "employers" under the meaning of WPL, insofar they were, at relevant times, officers with management control over the Company, who were acting on behalf of the Company with its consent.

80.     Because of the violation of WPL, Mr. Dubler requests damages against Hangsterfer's Laboratories, Ms. Jones and Ms. Jones Sheehan for:

      a.     Lost wages;

      b.     Compensatory damages;

      c.     Interest and/or Liquidated damages;

      d.     Attorneys' fees and costs; and

      e.     Such other relief as the Court deems reasonable and appropriate.

WHEREFORE, Plaintiff, Andrew Dubler, demands judgment against Defendants Hangsterfer's Laboratories, Ms. Jones and Ms. Jones Sheehan, jointly, severally, and in the alternative for damages; losses; interest; costs of suit; liquidated damages and other such relief as the Court deems just and proper.

### COUNT FIVE

### BREACH OF EXPRESS OR IMPLIED CONTRACT –
### FAILURE TO PAY SEVERANCE BENEFITS AND BONUS

### Against Defendant Hangsterfer's Laboratories

81.     Plaintiff incorporates paragraphs 1 through 52 as if set forth herein at length.

82.     Hangsterfer's and Mr. Dubler, as part of Mr. Dubler's employment and continued employment with the Company, entered into an express or implied contract wherein Hangsterfer's agreed to provide Mr. Dubler with severance benefits in the event he was terminated without cause.

83.     Hangsterfer's and Mr. Dubler, as part of Mr. Dubler's employment and continued employment with the Company (and further in exchange for agreeing to loan money to the Company) entered into an express or implied contract wherein Hangsterfer's agreed to provide Mr. Dubler with a $55,000 bonus.

84.     Plaintiff was terminated on or around August 3, 2009, without cause, and thus is entitled to severance benefits pursuant to an express or implied agreement.

85.     Plaintiff has demanded payment of the amounts owed to him under the terms of the express or implied contracts.  Hangsterfer's Laboratories has breached the terms of the express or implied contract and refused to make payments due.

86.     Because of Hangsterfer's Laboratories' breach of contract, Mr. Dubler requests damages against Hangsterfer's Laboratories for:

> a.     Compensatory and incidental damages;
>
> b.     Interest;
>
> c.     Attorneys' fees and costs; and
>
> d.     Such other relief as the Court deems reasonable and appropriate.

WHEREFORE, Plaintiff, Andrew Dubler, demands judgment against Defendant Hangsterfer's Laboratories for damages; losses; interest; costs of suit; and other such relief as the Court deems just and proper.

## JURY DEMAND

The Plaintiff hereby requests a trial by jury as to all issues referred to in the Complaint.

KLEHR, HARRISON, HARVEY, BRANZBURG
& ELLERS LLP
Attorneys for Plaintiff

Dated:   October 8, 2009                    By: _____

Charles A. Ercole, Esq. (CE 9458)
Lynn A. Collins, Esq.  (LC 9787)
457 Haddonfield Road, 5th Floor
Cherry Hill, NJ 08002-2220
(856) 486-7900
cercole@klehr.com
lcollins@klehr.com

25